amount of time. In the meantime, the court will call the next case. It was Edward. Mhm. Okay. We've called the next case. Council, please come forward and health. Morning, Your Honor's Ian Barnes for the appellant. I'm sorry. All right, fine. Would you like to start? Remind you that we've read the briefs. We've looked at the record. We're pretty familiar with this case. So let's start with your high points. Thank you, Your Honor. May it please the court, my colleague from the state. At trial, the state failed to meet its high burden of proof beyond a reasonable doubt that Mr. Gavin has a current mental disorder and that he is dangerous because a mental disorder makes him substantially probable to engage in acts of sexual violence. Unless your honors have questions about Mr. Gavin's alternative argument, I'd like to focus my argument this morning on this reasonable doubt argument, specifically three points. One of the state failed to prove causation between a mental disorder and Mr. Gavin's likelihood of reoffense. Second, that the state failed to prove that Mr. Gavin is dangerous because a mental disorder makes him substantially probable to reoffend. Excuse me. And third, that Mr. Gavin has a current mental disorder under the S.P.P. Act. And I'd like to begin with that causation argument, beginning with the principle that was articulated in Hassan versus Patel, which is that correlation is hardly synonymous with causation. At trial, no one offered an opinion that Mr. Gavin has a mental disorder that makes him substantially probable or that creates a substantial probability. The only opinion offered was that he is substantially probable. The Act uses those words, makes or creates, to indicate that that proof of causation is required. And what the state did offer at trial was merely two contemporaneous conclusions. Assuming, of course, that Mr. Gavin does have a mental disorder and is substantially probable, the state's case relies on those two things being contemporaneous, and they did not offer testimony that actually linked them together as one coming from the other. And if we look to the reasoning in Hassan versus Patel, we know that that is not sufficient. Hassan reasoned that contemporaneousness is problematic for two specific reasons. First of all, as I said, correlation is not causation. Secondly, if the trier of fact is left to assume causation from two contemporaneous things, that puts the burden on Mr. Gavin to disprove that causation in a case where he does not have a burden of proof. That burden rests entirely on the state, and that burden is proof beyond a reasonable doubt. So on that basis alone, this Court can reverse outright, and should reverse outright, because the state failed to meet its burden. But failing that point, that brings me to my second issue I'd like to talk about, which is that the state failed to prove that Mr. Gavin is dangerous because a mental disorder makes him substantially probable to reoffend. And given that substantially probable means much more likely than not, which must mean much more than 50 percent, the state failed to meet its burden on this element as well. The testimony at trial are you asking us to substitute our judgment for the trier of fact's judgment with regard to that issue? No, Your Honor. Certainly the standard of review is deferential, but that standard does encompass considering the entire record and not Well, the Court considered the entire record. It did, except for the fact that I would suggest Dr. Abbott offered a number of points in his testimony that were completely unrebutted. But that's my point. There's a battle of experts. That's what this case is all about. About experts? Yes. Right? I mean, there's no other testimony. So it's all about the judge making a decision between experts, two on one side, one on the other. Abbott's yours. The state has the two others. So the judge, having heard that testimony and listened to what they had to say, made a decision based upon what he heard. How can we then decide that something different from that judgment based upon the fact that it's expert testimony, and he believed the expert testimony of the state as opposed to Abbott's? Well, Your Honor, I would say that when the trier of fact hears unrebutted testimony from a defense expert that is not countered by any thing the state's experts had said previously, the Circuit Court can't simply disregard that. And that's based on what they heard. But they can judge. They can weigh it. And the weight it gives to that may not be very high. We can't weigh the evidence. You know, just because somebody says something that's unrebutted doesn't mean you have to believe it. Right? So, I mean, if that was the fact, cases would come out a lot differently. It would all be about rebuttal and unrebutted testimony. That's not the test. So that's just a question of how the court weighed what was said. And, again, in the courts in his ruling, believe the testimony of the state's witnesses. I can agree with Your Honor that that's what the Circuit Court concluded. But given that the standard of review still asks whether a rational trier of fact can find proof beyond a reasonable doubt, that still suggests that this court can look at all the evidence and conclude whether the outcome was the correct outcome, given the testimony. And the testimony doesn't rise to the level of proof beyond a reasonable doubt, given that really what this comes down to are two distinct things. The actuarial risk assessments that were done and the dynamic risk factors. Which are both cases have said that those are fine factors to be considered. Right? I agree with that. In fact, your expert did consider one of those factors. Absolutely. And I agree with that. The issue is in this case they weren't sufficient because if we consider that much more likely than not is much more than 50% probability, we have actuarials that say a person with Mr. Gavin's score of 7 has between a 20 and 30% chance of reoffense within 5 years, meaning he's 70 to 80% likely not to reoffend within 5 years. But this isn't a, you know, courts have said, and I know one of the arguments that you made had to do with making this a mathematical calculation. Assuming that, well, the law right now does not accept that. I don't think there's any cases that say except a mathematical calculation. So that's not what's the question. The question is the phrase that you, much more likely than not, and what that means. And it's not 70%, 60%, whatever. It's much more likely than not. Correct? Right. And part of Mr. Gavin's brief is trying to flesh out what that phrase means. And given that case law says preponderance of the evidence is more probable than not, more likely than not, majority of the evidence, if this standard is much more likely than not, and preponderance is more than 50%, much more likely than not, must be more than that. But why is there anything, what's in the record that would show that this judge did not consider that? It was much more likely than not. That was a test that Judge Ute mentioned that in his ruling. Well, one point to make is that the judge did misstate. He made a mistake. There was an error in his statement. But it's clear from the context that he knew what that meant. When you look at the other things he said with regard to the test. I hesitate to go down this road because I'd like to, unless Your Honor has a question about it, I'd like to focus on reasonable doubt. But, for example, if you take Dr. Abbott's testimony that dynamic risk factors can actually decrease accuracy, if we combine that with the testimony of Dr. Whitehall and Dr. Soflius, who both admitted that these risk factors can't be quantified, they can't be added up, they can't be aggregated, combined with these actuarial scores, that doesn't get us anywhere close to much more likely than not. How do you say that? On what basis do you say that? Well, if we look at the actuarials that say a person with a score of 7. Again, you're making it into a mathematical formula. You said the score of 7 was 30%. I mean, it isn't a mathematical calculation. I mean, that's, you know, I don't see how, that is not the test. It's not a mathematical calculation. I mean, we have, nobody knows the future. Nobody has a crystal ball. So we have three experts trying to determine, based on past actions and other factors, what might happen in the future. That's all we have. They may be right, they may be wrong. And the judge hears everything. He makes a determination. Based upon the state's experts, it's more likely, much more likely than not, that he would reoffend. Well, Your Honor, I certainly cannot dispute the fact that none of us can predict the future. And that's why the best we have are these actuarials, these dynamic risk factors. And if the risk factors can't be quantified, and the actuarials say he's far more likely to not reoffend, then a rational trier fact can't conclude, especially given the fact that there was unrefuted testimony that actuarials can overestimate risk as well, then a rational trier fact could not have found proof beyond a reasonable doubt. But failing that, the state, and this is my third point, the state, nevertheless, failed to prove that Mr. Gavin has a current mental disorder today. And that's really, this entire issue is best summed up by what Dr. Safliya said, which was, there's no evidence these disorders have gone away. In order to find that Mr. Gavin doesn't have a mental disorder under the act, she's expecting Mr. Gavin to prove a negative.  If he has a disease, a mental disease that continues, is chronic, doesn't go away, that's her testimony. Your expert testified different. Again, it's a question of which experts you're going to follow, isn't it? So, I mean, again, how can we second guess what the trial court did on this record? Well, on this point, Your Honor, the problem here is believing the state's witnesses requires speculation. And there's a number of ways in which the state's witnesses speculated, beginning with that claim that other specified paraphilic disorder is a chronic and lifelong illness. But that's based upon their experience as experts. Both of them said that. And I would suggest, Your Honor, that in a case where we're talking about expert testimony, where the standard under the rules of evidence is they can rely on things that are reasonably relied upon, their anecdotal experience, when there's no scientific literature to support that, is not something that can be believed. Especially when Dr. Abbott met their testimony by saying, there's no research on this topic. It does not exist. Well, if it doesn't exist, there's nothing that they can rely on. Right. So we're in an area where experience is important. And apparently, for whatever reasons, this hasn't been studied in that regard. So you're saying that just because there's never been any study of it, we can't use experience. That doesn't seem to make sense. Well, Your Honor, I think what I'm suggesting is we're in an area where, if indeed Mr. Gavin had a mental disorder in the 70s or the 80s, to get to today solely on the basis of the claim that it's chronic and lifelong, in their personal anecdotal experience, that's really no different than speculation. But it wasn't their personal and anecdotal. It's what they have come to believe based on their many-year career. And there's nothing in this record to suggest that that's unreasonable to consider that kind of information. Is there? I think the fact that there isn't any research or literature that's been done on the topic to substantiate that is reason enough to doubt it. But it also goes further than that because Mr. Gavin hasn't committed a sexually violent offense since 1988. He hasn't committed an act of sexual misconduct since 1991. And that included some time in the mid-90s where he was out in the community. Did he complete his courses that he was supposed to take, treatments? Do you mean in the TDF, Your Honor? Yeah. No, he is not included. Okay. So, I mean, as I understood the record, he hasn't done what he needed to do in order to help himself. That's part of what they – I mean, you seem to be saying there's just like one – you know, they don't have this one thing, the two experts. But there's many things they relied on. There's five or six different things that they relied on in addition or including their experience. So, you know, it's not just one thing. We have a combination of things that they testify to. And, you know, we have to look at the complete testimony, not just one aspect, and pull that out and say, well, there's no study, so I guess we have to throw up our hands. Well, I think there are two responses to that, Your Honor. First of all, there were other points of their testimony where they engaged in additional speculation where they said he could be having these thoughts and urges. Those thoughts and urges could be running rampant. There was no actual testimony or evidence that affirmatively backs up that Mr. Gavin has a mental disorder today. And I think that's really the crucial distinction here, that this isn't about what was happening 30 years ago or 35 years ago. It's what's happening today. That's what the act contemplates, a current mental disorder. And what we have in terms of evidence of a current mental disorder is essentially nothing. We have a handful of rule violations in the TDF that weren't sexual misconduct, that really involved, aside from him pushing a staff member, they involved no other people. And we have the doctors saying, well, he must be having these urges. And I would suggest, Your Honors, that that is precisely what proof beyond a reasonable doubt is supposed to protect against. It's supposed to protect against speculative evidence, against people guessing, against the absence of evidence, for example, on the causation element. Mr. Gavin's current mental state is unknown because the state couldn't provide evidence of his current thought process or his current mental state based on behavior or statements he's made, actions he's engaged in. So unless Your Honors have no further questions, I would ask this Court to reverse the judgment of the Circuit Court outright, which would end Mr. Gavin's indefinite detention or, in the alternative, for the reasons articulated in Section 2 of his brief, grant him a new trial. Thank you. May it please the Court, Assistant Attorney General Erin O'Connell on behalf of the people. I'd like to focus as well on the sufficiency claim raised by the respondent. This Court has accurately characterized his argument here as one to substitute this Court's assessment of the credibility of the experts for that of the trier of fact. And this case does come down to a battle of the experts. It comes down to a battle of two experts on behalf of the state against the defendant's own expert, who testified that he is not an SVP. Aren't we looking at very old information? The fact is that Dr. Desfilis was not looking at his current mental state but decades-old conduct, wasn't she? She was looking at the current mental state, but she was relying on the past conduct to inform her assessment. But that was decades ago. I mean, you would have to believe, I mean, the one thing you'd have to believe is once you have this disorder, that's it. I mean, this man's being denied his liberty. He's been in there for decades. And they're saying there's no cure, there's nothing to be done, he'll just be there for more decades. That's really their testimony. Isn't it? Based upon what he's done in the past. Well, I have actually quite a few responses to that. One is certainly the state expert did testify that this is a chronic illness, but they did not testify that there's nothing that can be done. All three experts said that he can reduce his probability to re-offend by engaging in sex offender treatment. He's been afforded that opportunity the entire time he's been in the TDF. He has not availed himself of that. And they've explained why that's important. The behaviors in the past are significant in understanding his mental processes. But they've also found present evidence that he continues to have cognitive distortions. The types of distortions that would be addressed in the treatment setting with sex offenders, that they could challenge his views of, in a lot of cases, he has tried to justify his behavior by, you know, the victim was asking for it type reasoning. That's the sort of thing that needs to be challenged and he needs to confront, and that's what the sex offender treatment is geared towards. I do agree that the majority of his behavior did occur in the past. It has occurred when he's been released from prison on each occasion. That's still a long time. Correct. But on each occasion it's significant that even though he suffered serious negative consequences from engaging in this behavior, he continues to have the impulses and he's unable to control the impulses to continue to victimize. Well, that's the question, though, isn't it? That begs the question. That is the question. Because if he still has a mental illness, it's one of the factors that we consider. And you're saying, well, he does because he didn't go to the clinics? No. The experts did testify that he currently has this disorder. They testified how this disorder works. They were certainly cross-examined on this point of, well, isn't his behavior from far in the past. But they really highlighted the aspects of his behaviors in committing those crimes and explaining why they believe he suffers from an inability to control his impulses and his desire to engage in this non-consensual behavior. But he hasn't had any problems in recent years? In recent years, he did actually continue to show sexual misconduct while he was in IDFC. But he's since been moved to the TDF where the whole purpose of that facility is to prevent sex offenders from engaging in further sex offenses. And it's only in that setting that he seems to have been able to control his behavior. There have continued to be rule violations, however. And, for example, he has had possession of massive quantities of pornography. And this was one basis for the experts to conclude that he continues to have very strong urges. He is continuing to violate the TDF rules with respect to that. And he's even said, even though he hasn't engaged in treatment, he's admitted that he has sort of an addiction to pornography. These are all factors that the experts looked at in assessing whether, even though the behaviors occurred in the past, we can infer that he continues to suffer from the same impulses, such that he would have a substantial probability of re-offending if released again, as he has in the past every time he's been released. He has re-engaged in this behavior. And I would just emphasize, it's not the fact that he has committed multiple sex offenses, but it's the circumstances of those offenses that are, in particular, what the experts relied on here. And there have been a couple of occasions where he has been confronted with police officers or correctional officers in the middle of engaging in a sexually violent attack. And he has been unable to stop himself. I mean, the description of one of the crimes is that police had to go up to him and literally hit him over the head with their guns to get him to stop a sexual assault that was in progress. And there was also an incident in IDOC where he attacked a woman. And again, the correctional officers tried to intervene, but he didn't have the sort of control or the awareness to stop, even when confronted with those circumstances. I did want to touch briefly on the causation issue, because I think it's important to note that defendant is leaving something out when he says there's a mental disorder and there's a substantial probability. Because it's within the definition of the mental disorder itself that he's predisposed to engage in future acts of sexual violence. That's not only part of implicit in the expert testimony that he does have the mental disorder, but it was laid out in detail. So Dr. Weidel directly testified. She was asked, do these conditions that you've identified, the otherwise specified paraphilic disorder, do they predispose him to commit future acts of sexual violence? And she said yes and explained why that was the case in the record at 434. It's inherent in particularly the paraphilic disorder. The basis of this diagnosis is that he has these very strong urges to engage in this sort of deviant behavior where he's disregarding the rights of these women who are not consenting, but yet he is so driven to engage in this that he's continuing to do so. And I did want to distinguish the fact that this is inherent in the disorder. It's really what puts into perspective their continued reliance on the Husson case, which is the civil case for causation that they rely on. In that case it was, did a steroid injection cause an infection? Is it a medical malpractice? It was, exactly. And it is to some extent informative of this question, however, because it was not inherent in a steroid injection that an infection would follow. Here it's inherent in the fact that he has this mental disorder that he's predisposed to engage in these acts. Then the testimony, based on that predisposition, how likely is it that he will reoffend, that testimony then takes into account other factors, including the actuarials in addition to the dynamic risk factors. And I did just want to touch very briefly on the request that this court quantify the substantial probability. The court's noted that that is not the law in Illinois now, and that's true and those cases are well-reasoned, but it's also supported by the testimony in this case. The state's experts were asked, can you just give a number to the probability that he will reoffend? And they both said, no, that's not an appropriate analysis in this field where you're looking at human behavior. It's not something you can put a number on. So I would urge the court not to risk overemphasizing the actuarial instruments here, which are just a piece of the analysis. I believe, according to Respondent's Counsel, Dr. Abbott said that they can overestimate risk. State experts have said as well that it can underestimate risk because it only looks at convictions for subsequent offenses. So these are really just a starting point, these numbers are. And then the experts in the court have to take a holistic approach at looking at, based on that number, do I go up or do I go down based on his circumstances? And they've identified the dynamic factors that really increase the risk here beyond the baseline number that the actuarial was assigning. And we would ask this court, in applying the sufficiency standard, to find that the trial court could rationally credit the testimony of the two state experts while rejecting that defendant's expert and, as a result, affirm the trust. What about the argument, Counsel, that the state's experts use the words, he could be having thoughts, this could happen, it might happen, these are words that don't show that it will? Well, they were hesitant. I think what Your Honor is referring to is they were hesitant to try to describe his mental processes sort of in the absence of evidence of what is going on, but they were explaining why they can nevertheless,  infer that he does continue to suffer from these disorders and does have a high risk of reoffending. And those would be the cognitive distortions that I've mentioned and the continuing unwillingness to accept responsibility, really, for his actions in assaulting all of these women. And they were unwilling to speculate as to what is exactly going on in his own mind, but they did point to the pornography possession as evidence that he continues to have urges. So unless there are further questions, we would ask the Court to affirm the judgment. Thank you. My colleague from the State mentioned Mr. Gavin's quote-unquote cognitive distortions that were based on the statements he had made about his offenses. And the testimony at trial was that the statements he had made about those offenses were to Dr. Abbott when Dr. Abbott had asked him to look back in time retroflexively and explain what his thinking was at the time. And that's crucial because it doesn't get us to today. And my colleague just said that the experts were trying to describe, in the absence of evidence, what was going on. And that's precisely the point here. There isn't evidence of mental disorder today. Well, I mean, the fact is that he's in a controlled situation. And again, the experts are trying to determine what the mental state is based upon interviews and everything else and what might happen if it was released. So, I mean, how else do you do that? Well, I don't know if there's another way to do it, but there are a couple of crucial points on that topic. First of all, my colleague said that Mr. Gavin has only stopped committing sexual misconduct since he's been in the TDF. That's belied by the record. Mr. Gavin was not admitted to the TDF until 2006. He has not had an act of sexual misconduct since 1991. And that did include time when he was out in the community in the mid-90s. But on top of that, in the TDF, he's free to walk around. He's not shackled. He's free to roam the halls as he pleases to go and exercise or do whatever else he might be doing. And yet, he has not engaged in these sort of behaviors that he did 30, 35 years ago, maybe even 40 years ago. And that reflects that he does not have a mental disorder today. And if there aren't those behaviors to look at, and there aren't statements that he has a current, you know, something saying, this is how I feel today, this is how, these are the thoughts I'm having today, then the state is exactly right that that is the absence of evidence. And the last point I'd like to touch on is the causation issue. To accept the state's argument that the second element of the SBP Act somehow also inherently includes that causation component, that would read sections of the third element into nonexistence. That language, that a person is dangerous because a mental disorder makes them substantially probable or creates a substantial probability, would become meaningless and redundant. And case law says that statutory interpretation requires that we look at the statute as it's written and, I should say, don't read parts of it into irrelevance. And that's exactly what the state is asking this court to do. And finally, I would just point out that the state's brief does state in it that both Dr. Saflius and Dr. Weidel testified that Mr. Gavin is dangerous because a mental disorder makes him substantially probable to re-offend. That was not their testimony. It was only that he is substantially probable. And if the state believed that the second element somehow demonstrates that causation, they would not have written into their brief that the experts had testified in a way that they did not actually testify. So if your honors have no further questions. I'm curious. Both of the state's experts did testify that he specifically has paraphilia, and that is in the DSM-V. It is defined as a mental disorder. And they both testified that there is no real cure for that. And we also have heard testimony that he has not done any treatment for it. So if we know that he has a mental disorder and he hasn't done any treatment, aren't we sort of stuck trying to figure out how to justify not specifically dealing with it in a way that the state has asked for? I mean, the paraphilia is serious. He's acted out on it before. He's acted out on it in controlled environments. He's acted out on it in front of prison guards and security guards. This is a serious concern for us. You're telling us that nobody said he had a mental illness. Well, two experts said that he did have a mental illness, paraphilia. I have a couple of responses to that. First, the specific diagnosis that Mr. Gavin received, other specified paraphilic disorder, sexually attracted to non-consenting persons, is not in the DSM-V. I'm not talking about the non-consenting person part. I agree with you. That may not be in the DSM-V. But the paraphilia, other specified paraphilic disorder, is in the DSM-V, and that is recognized as a mental illness. And that is recognized as something for which there is treatment, but it's chronic and can't be cured. And we've seen evidence that he has continued to act out in ways that demonstrate this, even in controlled environments, and even when there are policemen standing around with guns. That sounds very dangerous to me. So you're telling me he's not dangerous, and I'm saying I'm having a hard time seeing that. Well, on the controlled environment element, Your Honor, certainly there were acts of sexual misconduct that took place in the late 80s and early 90s while he was in custody. But since 1991, there haven't been any of those. He's continued to be in a controlled environment, and indeed out in the community, since 1991, where he has not engaged in these similar behaviors. So I would suggest that it isn't being in a controlled environment that has changed his behavior. It's something else that's changed his behavior, and that really undermines the claim of the State's experts that this is chronic and lifelong. He hasn't engaged in these behaviors. He hasn't done so since 1991. And the issue is, does he have a current mental disorder today? No one's denying that his past crimes are reprehensible or that we should not find them serious. But the question is, is he still dangerous today as a 61-year-old man? And the record doesn't support that he is dangerous today or that he has a mental disorder today. So if Your Honors have no further questions, I'd ask this Court to reverse outright or in the alternative grant Mr. Gavin any trial. I'd like to thank counsel for your excellent oral arguments and fine briefs. We'll take this matter under advisement, and an order will be entered soon. This Court is adjourned.